Next matter is Delrio-Mocci v. Connolly Properties May I please have three minutes for rebuttal? Sure. My name is Garrett Rowe. I'm with the Immigration Reform Law Institute, and I represent the appellant in this case, Mr. Robert Bomer. The case before the court is a RICO case. It alleges that the three individual appellees who are no longer in this case conspired to harbor illegal aliens. With the case, maybe you can help me in looking at Anza and Canyon County in particular and trying to get a RICO injury here. Can you elaborate on that? How do you get a RICO? I understand what you're saying, the nature of the injury is in the loss of value to the leasehold. But under Anza or Canyon County, is that enough? As far as injury to property, is that true? You're asking about injury to property? Is that correct? You're alleging injury to your property in the form of your leasehold. But you're alleging injury to your property in the form of your leasehold. Correct. And I'm asking you, if under those cases, the kind of injury that your client suffered, is that sufficient to establish a RICO injury? Well, yes, it is. Yes, it is, Your Honor. And again, I understand that the Anza case and the Canyon County case are after this circuit's decision in Gentee. However, nothing in either of those cases that I can see would affect this court's opinion in Gentee. How is the injury here sufficient? How is the injury here sufficient? Under RICO to get a RICO injury. Well, under RICO, there has to be an injury to property, obviously. An injury to property has to be an economic injury. It can't be an injury simply to a personal injury. And in this case, his injury to property is, again, the economic harm that he suffered in his leasehold interest. In this case, because of their harboring, it caused his leasehold interest to decline in market value, which is what this court, you know, stated in Gentee was permissible under a home. And also, this court later in the file... What if the same group of folks had moved into the property and the same injuries befell the property that you're alleging in your complaint without any involvement at all on the part of the defendants? It just happens that given the location of these properties, the rent structure, everything else, it would attract a group of folks who fall within this class of folks. And the same kind of injury follows. So the question is if, let's say, illegal aliens just moved into the properties, but it didn't involve harboring? I'm not saying it doesn't involve harboring. We can get into that discussion. But just assume that illegal aliens moved into the property because of the location, the rent structure, one person moves in, word gets out through word of mouth, hey, the rents here are not so bad, and people seem to be leaving this alone. And before you know it, you have an influx of illegal aliens. Well, that's a different issue, Your Honor, than what's presented here. If it wasn't a different issue, I wouldn't ask a hypothetical question. Well, okay, the reason it's different is because, again, it involves the RICO predicate acts of harboring. You wouldn't get to an injury of property under RICO... Can you try to answer the question without answering the question you want me to ask? Okay, I'm sorry. I'm forgetting about harboring for a second because there's a legal issue as to whether or not there's sufficient facilitation here to equate with harboring. What I'm trying to get is to the nature of the RICO injury and whether or not the kind of damage that you're alleging could have happened, it may well have happened, without any of the conduct on the part of your clients are alleging that they did. If the same thing would have come about, if you get enough direct injury under ANZO or Canyon County in particular, that's what I'm trying to get at. And you want to keep putting harboring back into it. But I'm trying to just focus on Canyon County where they said the people in that case may have gotten housing even without the defendant's actions and therefore there wasn't sufficient injury to bring the claim. That's what I'm trying to get to. Okay, I'm sorry. I may need to do something a little briefer on this issue because I'm not... I don't really understand your question. I apologize. Okay, well, I'm probably not asking it very well, but... Okay. Go ahead. Can I follow up? Would the injuries have happened anyway without, you know, the intervention of the defendants? Would you have had the injuries anyway? You seem to assert in your complaint, if I read it correctly, that the property was in deterioration already before the asserted scheme that you say resulted in all of these parade of horrors that you refer to. In other words, this property was already in bad shape and deteriorating. Okay, that's not true, Your Honor. Is that not what you asserted? No, that's not. I think it's in paragraph 69 or 70. What happened with this particular plaintiff is this, is that... You did not say that the apartments were already in deterioration? No, not Mr. Bulmer's property, no. And he is the only party in this complaint, at this point in the case. He's the only one who has the RICO action. So what happened was Mr. Bulmer actually lived at the Pingree Arms property prior to the appellees in this case taking over the management of that property. So at that point, it was still kept up to code. After the appellees took over that property, that's when the appellees decided to implement their scheme and start harboring legal aliens and encouraging and inducing them to reside in Mr. Bulmer's property for the express reason they could allow it to go into disrepair. So the scheme itself, when it comes to Mr. Bulmer, is that these injuries did not start until they implemented their scheme, which was when they took over the management of this property. Does that answer your question? Well, I have to go back and look at the record, but my reading of it was that this property was already in a deteriorating state before the scheme that you assert was actually in place. It was in paragraph 70 of the complaint where it said, prior to the CPI, which is counting properties, assuming management responsibilities of Bulmer's building, the building was maintained up to code. So what happened was after CPI took over the property, originally it was a different management company. He did have a right to evade rent, is that correct? That's correct, he did. In other words, he had a right to just withhold rent, and then that would obligate the defendants to make whatever repairs he believed that the illegal immigrants were causing. Correct. But inasmuch as he did not do that, isn't this an injury that he caused himself? No, it's not, Your Honor. Again, this goes to the issue of loss of money. I didn't think you would agree with that. Okay, sorry. I thought I would ask you anyway. Okay, this goes to the issue of, again, injury to property, it's loss of money in this case. Why doesn't it also go to prudential standing? I mean, RICO is one of those statutes, and I think we cited it in Saddam War, Saddam, and we tried to talk about the kinds of unintended consequences that can grow out of the way this thing is drafted, particularly this conspiracy counterpart of RICO. If we have a situation where the plaintiff, a RICO plaintiff, could have basically responded to or remedied some of the RICO injury that they're alleging simply by taking advantage of remedies they have under state law, is that the kind of prudential standing plaintiff that we should recognize bringing a RICO claim? As far as, again, I'm sorry. I'm not sure I understand your question, but I think the question is. Okay, well, you do understand that standing is always an issue. Yes, I understand. And we've got constitutional standing, prudential standing. Forget constitutional standing. I think that's clearly met on the face of the complaint. As to prudential standing and the prongs under that, to the extent that there may be others better situated to bring this kind of claim than somebody who has alternative state remedies, that's what I'm trying to get at, and I'm probably not saying it very well. Again, I think it was this court's holding. I don't have the case in front of me. It's in a footnote in our brief. There are a lot of footnotes in your brief. Sorry. I can get it to you here in a second. But in that case, it was a 2008 case, I think, from this court, where it said that the existence of a state law remedy does not prevent a party from also bringing a RICO claim. And I'll get that to you when I come back from rebuttal. That's a good answer. Okay. See, we're getting better. Okay. With that, can I move on to harboring or state? And I would like to bring up one more point, though, and that's the fact that while, of course, this court is allowed to look at any issue that was before the lower court, I don't think in this particular case that should apply, and that's because the appellees in this case aren't involved in this case anymore, as far as the issues in RICO go. They were not in the opening brief. No, I know I confused you. I think you're confusing me. Okay. I'm not sure I know what you mean by that. Well, in the lower court, the court declined. Did you say that the defendants are no longer in this case? The appellees have not chose to participate on appeal. They're participating via amicus. Is there a problem with that? Well, when it comes to looking at this issue in particular, I think it is, because the amicus, in this case, are asserting that they were not going to enlarge the issues before the court. There were certain issues involved in the opening brief, and those were harboring, encouraging, or inducing, and whether appellees were harboring and encouraging or inducing, and also whether an appellant could amend his complaint. However, in this case, the amicus decided to enlarge the issues that was before the court and bring up the issue of proximate cause and injury to property. So, again, obviously this court That's inherent in the veto claim. You've got to show proximate cause in order to make out the veto claim. It's got to appear in the face of your complaint. Okay. But you want to address why the district court dismissed your complaint, don't you? Yes, that would be harboring and encouraging or inducing. So let me just really touch on that, because I see I'm running out of time. The main issue in this case is harboring. Obviously, the Hazleton opinion came down, which is a preemption case. I'm very familiar with Hazleton. Yes, I figured you would be, Judge P. In that case, the court held that harboring in this circuit requires substantially facilitating an alien's lawful presence and conduct which prevents detecting an alien's presence. Prevent government authorities from detecting an alien's presence. Correct. Prevent government authorities from detecting. Isn't that what you left out in the complaint that you filed in the district court? No, it's not, Judge Fuentes. Sorry. That's what the court held in the lower court, is that we did not properly allege preventing detection. However, the way the lower court dismissed it was based on a standard of, I think it was called, material and affirmative conduct. Affirmative and material conduct was needed. Well, this court, in two opinions, the Oslik opinion, and also in the recently vacated Hazleton opinion, had a lower standard than that. The only discussion in the Oslik opinion regarding preventing detection was the statement by the court which said that physical barrier and artifice are a trick, which implies a lower standard than affirmative or material conduct. Additionally, in Hazleton, the standard was reduces the likelihood. Now, Meeke, in this case, has said that the reasoning in Hazleton was appropriate. Well, clearly there's got to be something more than housing. Right. Something more than housing. That's all it required. In this case, Mr. Bulmer alleged much more than housing. He alleged that they implemented a steering scheme. I'm sorry, he alleged what? He alleged they implemented a steering scheme where they would put certain individuals, illegal aliens in certain properties, white citizens in certain properties, Hispanics in certain properties, the lawful black citizens in certain properties, but they were careful to put the illegal aliens into certain properties. And the reason was— Is that a scheme that prevented law enforcement authorities from detecting— I think it made it easier to detect. No, actually, well, two responses to that. One, their purpose for doing it was to make it more difficult for them to detect them because what the appellees believed were two things. Actually, would it make it easier? Actually, let me discuss that just one second. This was the reason why appellees believed this made it more difficult. First off, they believed that by harboring them in certain buildings, they could let those buildings be run down, and the illegal aliens would be too nervous or too scared to contact them. But we're talking about government detection at the presence of illegal aliens. You're correct, and I'm getting there in a second. Sorry. You're getting there slowly. What they believed was that the government authorities would not detect them because the illegal aliens would not complain about the code violations. If they put U.S. citizens in those buildings, U.S. citizens would complain, and government authorities would be called. Illegal aliens would not be called. The other reason that they believed that it would prevent detection was because they wanted to specifically separate illegal aliens from the black American citizens because they were concerned that if black citizens and Hispanic illegal aliens were put in the same buildings, it would lead to fights, and again, government authorities would be called to the property. That assumes that the illegal aliens who are Hispanic or Latino or whatever would not appear to be black. You're assuming there are two universes of people that are totally distinct. You're right, and this goes back to the complaint. This involved their steering scheme. What happened was they specifically marketed to Hispanic illegal aliens. They hired a Hispanic leasing agent who later became our plaintiff to speak with them, ordered her to put flyers in certain areas, handwritten flyers in certain areas they believed Hispanic illegal aliens would frequent. Let me get, if I understand you correctly, so that these two groups were segregated so that they would not fight because if they did fight, that would attract the attention of the police? That is what appellees believed. That was one of the purposes for setting their steering scheme. But there's also two other issues involving government detection. One is the false documents. They wanted to keep records on file, tenant records, in case they're investigated. They allowed illegal aliens to present false documents or false identities so if they were ever investigated, they'd have a tenant file. They also discussed the issue of not doing commercial background screenings. I'm sorry, not doing? Commercial background screenings, which they required of U.S. citizens but did not require of illegal aliens. What good would that do? Because the illegal aliens in this case were using false identities and this could show that possibly individuals who were not lawfully present or who had false identities were living in their buildings. I'm confused with that. Is there an obligation that landlords in New Jersey anyhow do background, you're saying not do commercial background schemes. Are you talking about for rest records? No, no, no, no. Again, this goes back to the issue. This was brought up in the amici. Is that like a Google search? No. Again, this is coming from... In New Jersey, landlords were doing to investigate the legitimacy of their prospective tenants. Is there such a thing? Again, this issue involved a discussion with somebody who was involved or knew about the scheme. Apparently, they're in New Jersey. Apparently, I don't know much about it, but they were able to actually do background checks as far as income and stuff like that. It is your case. You're asserting that this should have been done. Well, I'm actually not asserting it should have been done. I'm saying they specifically did not do it for illegal aliens, but they did it for U.S. citizens. And what is it that they didn't do? They did not do the commercial background scannings, and they did not require documents. What is the commercial background? Apparently, there was some program that they had which they didn't. When you started out, you answered a question with, apparently, there was some. This gave me a high level of confidence in the answer. There was a program that the appellees used through a third-party company where they could run Social Security numbers through it to do background checks. Now, I don't know to the extent of what those searches did. You're talking about credit checks on tenants? What? You're talking about credit checks on tenants? Yes, credit checks, yes. And they did credit checks on some folks and not on others. They did it on the citizens and the lawful aliens. They would not do it on the illegal aliens. How did they know, according to your complaint, who was the citizen? How did they know when to do a background check and when not to? Okay, this goes back to the part of their scheme. What happens is somebody showed up to the office who was Hispanic and could not speak English. The leasing agent was required to ask whether the person had documents. And if they did not, they determined that person was an illegal alien, would put them in a certain building, would allow them to come back with false documents, would specifically not run them through these background screenings. So this was something that the appellees themselves instituted so they could successfully implement their scheme. So someone shows up who can, they can't speak English and they have a Latino or Hispanic surname. Correct. It's assumed they're an illegal alien and they go to one building. By the appellees, yes, that was the scheme. And they ordered their leasing agent to ask. Because the presence of what you call an illegal alien in an apartment doesn't necessarily mean that immigration is looking for them, does it? No, it doesn't, Your Honor. I mean, is it not perfectly legitimate for some illegal aliens, assuming they're illegal aliens, to live in an apartment? That's absolutely true, Your Honor. That is true. So why would you need to do commercial-type investigations on that group but not on other groups? This goes back to, again, why this is harboring. It goes back to the fact that these individual landlords, these appellees, believed what they were doing was illegal. In the complaint, we allege that David Connolly, who's the president of Connolly Properties, said, if everybody keeps quiet, nobody's going to go to jail. And Dana Ayala is the vice president. Who is this statement allegedly made to? And it's important in answering the question, focus only on the complaint, and I'll go back and take another look at it. But that's what we're limited to. Who is this statement made to? It was made to the other two appellees plus the leasing agent, who was another plaintiff in this case previously. When it came to Dana Ayala— So he was saying to them, keep quiet and nobody will get in trouble. Correct. To the leasing agent and— And to the other two appellees, which is Dana Molina, who was the property manager, and Dana Ayala, who was the vice president of the company. He wasn't saying it to the aliens themselves. He was saying that, keep quiet to—yes, correct. He was saying it to the leasing agents, don't go talking about this so we don't get in trouble. Dana Ayala said that if anybody found out what we were doing, we'd go to jail. So, again, they knew what they were doing, and that's the reason they set up this scheme. They did not want government authorities coming in and finding these illegal aliens here. Well, what is the thing that they thought would send them to jail, aside from criminal offense? Well, again, apparently it was they thought they were harboring illegal aliens. Now, again, if this was just a normal landlord-tenant relationship, where the landlord was not asking about immigration status, was not discriminatorily steering individuals into certain properties, setting up a scheme, which the appellees themselves believed would best prevent government authorities from detecting their presence, it would be a whole different scenario. We wouldn't be here today, but that's not what happened. I'm not sure you wouldn't be here, but it would be a different scenario. I think you'd still be here. Okay. Is there anything else? I don't know. And he did deserve some time out here. Good morning, Your Honors. May it please the Court, Robert Polumbus. It's good afternoon now. Good afternoon. We're open to the approaching evening. It's been a pretty solid good night. Yeah. And then it'd be good morning again. The circle game. Robert Polumbus on behalf of the Amicus Latin American Coalition. With me at Council's table is Marco Gonzalez from Duane Morris. I want to thank you at the start for the opportunity to argue on behalf of Amicus in this case. Your Honors, the plaintiff has tried to dress up his allegations to plead a violation of the INA, but ultimately this comes down to an attempt to criminalize conduct that no court has held is illegal, and that's renting to undocumented immigrants. Well, he's saying there's a lot more involved than renting. In fact, he just said, look, if this was just renting, it wouldn't be a problem. So he's alleging a lot more than renting. He's alleging a form of sheltering. The steering thing, I don't know how to handle that term because that's not in our cases, but clearly he's alleging sheltering and facilitating the illegal presence here and a scheme devised around that. So maybe you could respond to that. Certainly, Your Honor. Am I wrong? No, I think that's right. I think there are essentially three categories of allegations. As you mentioned, let's keep quiet about it. Right. Which is, as the Court noted and as Mr. Rowe admitted, that's said to the employees, not to the immigrants, and that's an important distinction, I think. Well, but that's like the case where the person was told to stay alone.  That's exactly right, Your Honor. And the Court said that there wasn't an attempt to harbor in that case because it was obvious advice that anybody could have given. Now, the three categories, the something more that's alleged here, are the targeting of undocumented immigrants' tenants, the issues and the allegations about discriminatory background checks or accepting certain documents that may have been false, and then the steering allegations. The first two of those categories do not go to harboring at all. They're not relevant to whether the conduct substantially facilitated presence in the country or whether it prevented government detection. And they may be relevant. I think they are relevant to the landlord's knowledge of renting to undocumented immigrants. That has never been contested by the defendants. So I really think that the Court can put those sets of allegations aside because there's nothing that prevents a landlord from knowingly renting to an undocumented immigrant. If an undocumented immigrant comes in and says, hey, I'm here unlawfully, the landlord can still rent. And as you noted, that's been conceded here today again. What we're really talking about is this. In which case, it may not make a lot of sense to run a background check. Either the person's here illegally or I get a credit report. Which would be interesting. That might explain this thing where certain persons have a background check and then certain persons don't. You run a background check usually to get a credit report to find out is this guy going to pay rent, is this person going to pay rent. The person's here illegally. I'm not sure what value you get running a background check on them or a credit report. Make that both ways. I'm sorry? Make that both ways because they might come back and say, well, yeah, they weren't that concerned about getting the rent. It was part of their overall scheme to let the property run down and get more and more people in there. The fact that you wouldn't run a background check because you're not expecting a credit report, in some sense that helps you because it explains it in a very innocent way, innocuous way. But in some sense it feeds into their argument because they can say it just shows their intent in terms of what they were trying to do by getting a concentrated group of folks into this building, and that's where the peaceful injury comes from. Well, and so let's talk about the steering. Really getting a concentrated group of people in the building is the steering allegation. That is not conduct that tends to prevent government detection. The undocumented immigrants are alleged to be in plain sight, living in one of the or many of the apartment buildings. Was there a change in demographics in this building? Was it really so-called steering to bring in a certain group of people right after Connolly Properties took over, or was the demographic makeup of the structures pretty much the same? I think what's alleged, Your Honor, is that during the course of the management, Mr. Bolmer went from living in a building that was mostly white and African-American, a majority white and African-American, to a majority Hispanic. It doesn't say it was a majority of undocumented immigrants. It just says a majority of Hispanic. Even if we assume, for the sake of argument, that all of the new people that came to the building were undocumented immigrants, there's no allegation here that it was exclusively undocumented immigrants in the building. There's no allegation that there was no other groups in the building or that there weren't other people there who would have called police. Was there any evidence or anything in the record to suggest that any single undocumented immigrant was ever apprehended or charged as a tenant or resident in that structure? There are no allegations to that effect, Your Honor. Ever police or immigration called to the scene? No allegations to that effect, Your Honor. What concentration of the building was composed, allegedly, of illegal aliens? I'm sorry, Your Honor? Is it alleged the concentration in the building of buildings comprised of illegal aliens? It is not alleged with any specificity. It's alleged that a majority of Mr. Bolmer's building became Hispanic. Became Hispanic? Hispanic. It isn't alleged what percentage is illegal aliens, and frankly you can understand it might be difficult for Mr. Bolmer to allege with any specificity on that, but this is the theory on which his claim depends. This is how he's getting to the prevention of detection prong, is by saying that there is an almost exclusive segregation here that's preventing fights between races, preventing potential fights between races, which is preventing a potential call to the police, which is preventing a potential call to ICE, which is preventing the potential raid on the building. That's the link in one regard. The other is that these buildings can be allowed to go into disrepair without an undocumented immigrant blowing the whistle on it. Well, that also depends on having a building full exclusively of undocumented immigrants, and obviously we know that's not the case because Mr. Bolmer is in one of these buildings. Is that a question of fact that has to be resolved? In other words, this idea that we're going to segregate groups in order to prevent fights, in order to prevent police involvement in this building? I don't think it is, Your Honor. I think that on its face this is not conduct that tends to prevent government detection. The kind of conduct that's fallen into that category is provision of false documents  It comes in the context of employment relationships where there's an obligation to collect documentation and to do background checks to verify immigration status. Here, it also could come in the context of warning immigrants about ongoing investigations or an imminent raid. It's usually where it pops up. It's the warning, the gesturing, or basically the warning of investigators. That's right. And there's nothing to that effect here. You've got, again, a group of undocumented immigrants allegedly living in plain sight and grouped somewhat together according to the complaint. We're not sure how. But the connection between that and any actual effect on a government investigation is extremely attenuated and not anywhere remotely close to what's been found to be harboring in other cases. This court has upheld the prevention of detection prong in four cases in the last three years. It's clearly embedded in this court's jurisprudence. And I would say that in the Lozano case, Your Honor, Judge McKee mentioned that what's required is an act of obstruction. And here we don't have anything that remotely comes close to an act of obstruction. Your Honor has raised the issue of RICO standing. I think that's an equally strong basis on which the court can affirm. It was raised fully before the district court. This court didn't reach it because it had reached the harboring issue, but it certainly was briefed and raised before the district court. And what Mr. Bulmer is trying to do is to turn a landlord-tenant dispute about the conditions of his apartment into a federal RICO claim. This is truly expanding the statute, I think, beyond where it goes. There's no standing because he has no concrete financial injury, concrete financial loss. He has only an intangible property interest. There are cases, though, that say that a loss to a leasehold could be sufficient to amount to a property loss under RICO. I think that where the loss is, the connection between the conduct and the alleged loss is so speculative as this. There's a real problem. I'm sorry, I forget who on the panel asked this. There are allegations in the complaint that the buildings as a whole, and Mr. Bulmer's building in particular, was already in disrepair prior to the scheme. In fact, it was part of the motivating factor for the scheme that the properties were dilapidated. I thought I had seen that somewhere in the complaint. I would refer you to Paragraph 7, Paragraph 37, Paragraph 67. Was it 7, 37, and 67?  And then, Your Honors, in addition to that, we have many of the other buildings. These are admittedly not Mr. Bulmer's buildings, but other buildings for the plaintiffs who have now settled that are equally in disrepair, and that's 91 through 95 and 110 through 111. If you read the complaint as a whole, you certainly get the sense this is not and has never been a good place to live. It is a novel theory, at least from my standpoint, that you can establish damages by a reduction in the value of a leasehold, for example, because you do have remedies. You have municipal code violation type remedies. You have a rent abatement type of remedy. You can just not pay any rent, and then you get sued, and you go to court, and you say the place is inhabitable, and you get damages, et cetera, et cetera. That's why I asked about prudential standing. It seems like triple damages are a huge magnet. You know, in the case I wrote a few years ago where a bail bond company sued another bail bond company in New Jersey because it said the defendant was not paying the proper taxes which you had to pay on bail bonds, and the plaintiff said we're paying them, and therefore it's unfair competition because we have this expense, and you're not paying them. And the opinion says, look, you're not paying the taxes. The state's going to have to go collect them. You can't sue because you could sue them for everything they're doing that's wrong, underpaying their employees and just that much. And that's ANZA, basically. That's right, exactly. I don't know the opinion you're referring to, Judge Greenberg, but that's ANZA, and that's the direct consequence of the injury is the failure to pay. The injury is the failure to pay taxes, and that's an injury to the state, not an injury to the plaintiff. I remember they said, well, the state didn't know, and I remember telling them, after this argument, they'll know. But that's a published opinion. I don't know whether they owe the taxes or not. The argument was made that they do owe them. They did owe them. And, Your Honor, if I could just turn to one more issue under the INA, and we haven't talked about this much, but there's the separate predicate act of encouraging or inducing aliens to remain in the United States unlawfully. And that's a separate count from the harboring allegations. Well, they would have an easier way to go with that under that standard, wouldn't they? I mean, it's just helping somebody remain in the country illegally. And that's how they interpret it, to just helping. First of all, the case law on this requires much more than that. It, again, comes in the immigration context. What do we do with that terminology, just helping somebody remain in the country illegally? That would be a violation of INA. To read it that broadly, Your Honor, would be to blow open the doors for criminal liability and RICO liability. How do you cabinet? I think what you cabinet is by saying that what the case law said, affirmative conduct that's directly related to a violation. So that would be escorting somebody across the borders illegally. It would be doing something in the employment context. And the employment context is different than this because the undocumented immigrant doesn't have a right to be employed in the country, whereas there's no such prohibition. How about renting an apartment to somebody that I know is an undocumented alien and I say to my staff, be quiet, don't tell anybody that this person does not have proper documentation? That's not sufficient because the commercial landlord-tenant relationship could be replicated by that undocumented immigrant with anybody. This actually is similar to— Canyon County. I'm sorry, I was going to say Oslek. You've essentially got a situation where you can replicate this same assistance, but the alien can just go to another landlord and get an apartment there. So that's not truly helping. It's not encouraging or inducing. It's different from providing a job where there's no ability to walk into an employer and get a job unless you have proper documentation. Isn't the real issue here is who's going to enforce these laws? I mean, in some places, if you enforce the laws against employment of illegal aliens, you couldn't get the grass cut. I'm not being funny. You're a gasoline pump. I mean, it's a larger question in this sense than this case. I agree with that, Judge Greenberg, and I think that just as the corollary to that, a reversal in this case would have dramatic effects. It would just set a new precedent that's never been set before, that renting to illegal aliens can now— When I read the complaint, I thought to myself, well, if this is so, then I guess every landlord is going to have to make himself into an ICE officer. That's right, Your Honor. I think that's exactly right. Or just decide that they're not going to rent to anybody they perceive to be undocumented. I thought that, too, for a second. I thought to myself, well, if they do it on a racial basis, the problem is that's got problems of its own because there's laws on that one which go the other way. That's right. I mean, no landlord has an impossible problem. They're in an impossible situation, and something dramatic is going to— something will change. If you're a lawyer counseling landlords, you're going to now counsel them, hey, you've got criminal liability, criminal exposure, and potential trouble damages. If you don't take some affirmative steps to either confirm the immigration status of your tenants, to completely avoid any knowledge about the immigration status of the tenants, and according to Mr. Balmer's theory, which is that— Willful blindness helps. See, the landlord is in this position. If you don't take the affirmative steps, then you can be held for that. But if you do take what you think are affirmative steps, you're liable to find yourself a defendant in the discrimination case. I mean, because after all, you're not writing to Hispanics, for example. They've got a big problem. That's right, Your Honor, and I think the problem is exacerbated by the reading of the harboring provision that Mr. Balmer gives, which is that any conduct that makes it somehow less likely that the government could come in and detect aliens, not actually prevent or not tend to prevent, but just make it less likely, you've now got a harboring violation. I hear you're saying it's worse than that because the allegations are not focused on illegal aliens, but on Hispanic, or people who don't speak English. You're saying that the allegations that you're focusing on, in terms of a majority of the building became Hispanic, not majority of the building became illegal aliens. I can show very easily buildings in the Bronx where nobody speaks English and they're all American citizens. It's been that way for 50 years. Right, and to be fair, Judge McKee, just in candor, there are other allegations that they were renting to undocumented immigrants. So what I was referring to with the majority Hispanics, that's the only point at which we get any kind of quantification of what the steering resulted in, just to be fair about that. Okay, thank you very much, Your Honors. Thank you. Mr. O'Rourke, you have some time, I think. First off, to answer your question earlier regarding Landlord-Tenant, the case is Malley-Duff & Associates, 792 F.3D 350, pages 353 to 354. I'm sorry, say that again, please. Malley-Duff & Associates, 792 F.3D 350, and it's pages 353 to 354, where it held that the remedy of a common law, like state law remedy, does not prevent a RICO claim. Could I ask you a question? I have a quote here, and this is from Lozano, that you're familiar with, I'm sure. And in that case, Judge McKee wrote that it is highly unlikely that a landlord's renting of an apartment to an alien, lacking lawful immigration status, could ever without more satisfying the definition of harboring. Could I get your take on that? Just renting an apartment to someone that you know lacks proper documentation is not harboring. Well, I think that gets to the circuit split, and also why the facts in this case are so important. Well, but this is the third circuit. Correct. Correct. In this circuit, that is an accurate statement. Now, it may not be in a different circuit, but in this circuit, that's an accurate statement. We have to follow it. Correct. And that's why the facts in this case are so important. That's why I stated earlier, had this just been a simple landlord-tenant relationship where the landlord knowingly rented to elite Lillians, it wouldn't be a problem. But the issue in this case is that he did so much more. He steered them to try to prevent detection. He targeted them as a market, asked about immigration status when anybody came in that they thought themselves, through their own personal bias, was unlawfully in the country. How is that obstructing? How is that harboring in a sense that it's obstructing government officials from detecting the presence of illegal immigrants? This goes to the standard, what constitutes obstruction. In the Lozano case, the court said it has to reduce the likelihood of discovery. If you look at other cases, for instance, the Seventh Circuit, in the United States v. Higee case, it looked to determine what constitutes preventing detection, shield from detection in that case, and they said that it can be done through nominal means. It can be through any means, and those can be nominal acts. What is the allegation here? Here, again, it goes back to the steering issue. The issue here is that the appellees themselves were the ones that believed their actions would prevent. You put them all in the same place, dealing with deteriorate, but you don't have to worry about them complaining. Therefore, you're decreasing the likelihood of detection. That's correct. And the fighting issue, yes. And again, the issue here goes to intent, though. I mean, the appellees themselves were the ones who believed that their actions were preventing detection. So in this kind of issue, the question is, does the appellee's intent matter? I mean, and I think it does. And I want to address Judge Greenberg's issue, a couple issues by Judge Greenberg involving discrimination. The issue regarding whether or not landlords might discriminate if they are held to the standard. Well, I think the standard of harboring being renting. Given the drafting of the complaint, you might say to Judge Greenberg, do you seriously think that landlords would discriminate if we find some liability because the majority of their buildings are Hispanic? Well, no, I don't think that's. The obvious answer is yes there. Well, I think that would be discrimination, yes. And I think in this case, the point is, is that these appellants themselves are the ones who came up with this scheme. They were the ones who chose to ask about immigration status, if somebody was Hispanic. And they were the ones who chose to harbor people in various, to harbor illegal elements in certain buildings. But to go to the question of whether or not the landlord has the impossible choice of complying with harboring or complying with discrimination, the Chamber of Commerce v. Whiting case actually decided that. And they said that in the employer's context, because that was the same argument being made before that court. Yeah, employers are very different because there's a different duty on an employer than there is on a landlord. This is a very different situation when you get into an employer. There's a whole, and Lozano gets into the entirety of the very complicated, very intricate scheme that's arisen that Congress is not even sure about vis-a-vis E-Verify and whether it should be required or not. The minute you start talking employer, it seems to me it's a very different concept than giving someone shelter, which they need. But the difference is it goes to the discrimination issue. If the employer, you know, the employer, or sorry, not the employer, the landlord, he's bound by discrimination laws. He's not allowed to violate those. He's not allowed to violate criminal INA either. So the landlord who simply, who does his job, you know, just does the normal landlord-tenant relationship is not going to violate either of those two statutes. The difference here is that he. What is the normal landlord-tenant relationship in this context? In this context, a landlord treats everybody. A lot of his tenants are Latino. The tenants that come in, the landlord treats everybody the same. They don't rent to them on the basis of immigration status and don't rent to them on the basis of their, of the color of their skin. That would be the, would be a normal landlord relationship. That's not what we have here. And the issue on, you know, the Mr. Boehmer's, Mr. Boehmer's building becoming mostly Hispanic. That was, I think it was paragraph 71, 70 or 71 of the complaint. What that gets to is this. Is that the appellees themselves had a system that they believed they were discovering illegal aliens. They believed that people who came in who were Hispanic and who believed did not speak English that, you know, after they asked about immigration documents that they determined those people were in the country unlawfully. So what they did is they stored them in a certain building. Now Mr. Boehmer noticed that individuals coming into his building fit that profile. Now that doesn't assume that Mr. Boehmer himself knew that they were illegal aliens. But the difference is, is that the appellees themselves were harboring, were, knew that, you know, believed they were illegal aliens and another plaintiff in this case, earlier in this case confirmed that. They thought they were illegal aliens because they were Hispanic and didn't speak English. Based on the appellee's own system. Did you go into the Bronx or parts of Brooklyn? Again, Your Honor, this goes back to the issue of this case. This is the appellee's belief. The appellee's themselves are the ones who came up with this scheme. I'm not saying that people who are Hispanic and don't speak English are always illegal aliens. I'm not saying that. I'm saying that was the scheme in this case. The appellees focused on those individuals and then asked for their immigration documents. If they didn't have them, that's how the appellees themselves determined these individuals were illegal aliens and they are the ones who implemented the scheme and steered individuals into those certain properties. How do you respond to this? This is Greenberg who asked the inquiry about, and again, I think it's the DM. I'm not sure. I think we talked about it at length in the DM. I think it was then Judge Alito's opinion. The danger of allowing RICO to become the camel in the tent, that any time you can find some kind of violation that you can arguably claim constitutes a predicate act, which are growing by the minute, it seems, perhaps as evidenced by this case, you can then go into federal court and take, here we have a landlord-tenant dispute. It could be a dispute with a car dealer. It could be a problem when I rent a car from Hertz. I could allege some kind of interstate violation. And everything becomes a RICO conspiracy. How do we, if you're right, how do we write an opinion that eliminates that potential problem? Well, I think you do it in a couple ways. First off, you look at what's being alleged. For instance, in this case, the harboring of illegal aliens. It's not just any landlord. I'm sorry, go ahead. It's coming back to harboring. I'm not sure harboring is nearly as strong. Or encouraging or inducing, either way. It goes back to what the alleged predicate act is. Again, a normal landlord-tenant relationship, you're not going to have the RICO predicate acts. So that's one way to limit it. The other way is obviously the proximate cause. Did the allegations directly cause the plaintiff's injury? In this case, again, we've alleged that. Are you saying that's a good point for you? I'm sorry? Are you saying that's a good point for you? The proximate cause issue? Yes, Your Honor. If you look at the commercial cleaning services versus Collins Service Systems, which is on the second circuit of 271 F.3D 374, page 383. This is the exact situation that we have here, except it involves the hiring of illegal aliens instead of the harboring or encouraging or inducing. Again, I'll just quote from the case. Collin objects, that was the defendant, that any reduced labor costs were due to the alleged underemployment of workers and failure to pay other employment-related costs during business, not its participation in the illegal immigrant hiring scheme. The court rejected that, saying that the purpose of the alleged violation under 1324 was the hiring of illegal alien workers so as to take advantage of their diminished bargaining position so as to employ a cheaper labor force and compete unfairly on the basis of lower costs, which is exactly what we have here. Just for the purpose of... One, again, employer-employee is different than landlord-tenant, and I must say the law on our circuit is consistent with what you just read from that opinion. Yeah. We do want to send your argument. Let's go over a little bit on rebuttal. Thank you very much. We'll take you back to your advising.